**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ROBERT G. HARVEY,

    Plaintiff,

vs

APPNET SYSTEMS, INC., a Delaware
corporation and KEN S. BAJAJ,
jointly and severally,

    Defendants.

Civil No. 99-CV-76041-DT

Judge Patrick J. Duggan

---

WILLIAMS, WILLIAMS, RUBY & PLUNKETT
BY: JAMES A. WILLIAMS (P22349)
    JOHN W. GRIFFEN, JR. (P14375)
    RICHARD E. RASSEL, III, (P57540)
Attorneys for Plaintiff
380 N. Old Woodward, Suite 300
Birmingham, MI 48009
(248) 642-0333/Fax 642-0856

HOWARD B. IWREY (P39635)
Attorney for Defendants, AppNet
Systems, Inc. and Ken S. Bajaj
Honigman, Miller, Schwartz & Cohn
2290 1st National Bank Bldg.
660 Woodward Avenue
Detroit, Michigan 48226
(313) 465-7000

HOOPER HATHAWAY PRICE BEUCHE & WALLACE
BY: CHARLES W. BORGSDORF (P24756)
Co-Counsel for Plaintiff
126 S. Main St.
Ann Arbor, MI 48104
(734) 662-4426/Fax 662-9559

Of Counsel:
Daniel A. Masur
Mark W. Ryan
Gary A. Winters
MAYER, BROWN & PLATT
1909 K St., N.W.
Washington, D.C. 20006
(202) 263-3000

---

## **FIRST AMENDED COMPLAINT**

Plaintiff, ROBERT G. HARVEY, by and through his counsel WILLIAMS, WILLIAMS, RUBY & PLUNKETT, P.C., files this First Amended Complaint and reliance upon jury demand against Defendants APPNET SYSTEMS, INC. ("APPNET"), a

Delaware corporation and KEN S. BAJAJ, jointly and severally, and in support thereof, states as follows:

1. Plaintiff, Robert G. Harvey, resides in the City of Bloomfield Hills, Oakland County, Michigan, was a co-founder of AppNet, was a Senior Vice President for Application Development Services for AppNet and was based in AppNet's offices in Ann Arbor, Washtenaw County, Michigan.

2. Defendant AppNet is a Delaware corporation qualified to do business in Michigan and which does conduct business in Michigan from its offices in Washtenaw County, Michigan.

3. Defendant Kenneth Bajaj is a resident of the State of Maryland, is the President of Defendant AppNet and, in his individual capacity solicited Plaintiff in the State of Michigan to collaborate with and join in the formation of AppNet.

4. On or about September 1, 1997, Defendant Bajaj contacted Plaintiff to join with him in the formation of a company that would provide information services utilizing the Internet. Some time later in September 1997, Defendant Bajaj met with Plaintiff in the State of Michigan to compare their initial thoughts and agreed to proceed with the establishment of AppNet.

5. From the date of their initial meeting in Michigan, the Plaintiff devoted his full time efforts to the establishment, incorporation and growth of AppNet. Plaintiff and Defendant met many times and had continuous contact regarding each party's progress.

6. Together Defendant and Plaintiff sought support from Fairfax Partners of Tysons Corners, Virginia to develop a business plan for AppNet. The strategy being to

2

obtain external investment with which the founders would acquire information services companies and take the resulting company public as soon as possible.

7. On or about September 22, 1997, Plaintiff began the initial acquisition conversations with Arbor Intelligent Systems, Inc. whose offices were in Ann Arbor, Washtenaw County, in the State of Michigan.

8. On or about November 18, 1997, Plaintiff, Defendant Bajaj, and Fair Fax Partners incorporated Internet Applications, Inc. and soon changed its name to AppNet Systems, Inc.

9. In February 1998, Defendant Bajaj, Plaintiff Harvey, Terrance McManus ("McManus") and Robert McCalley ("McCalley"), the founders, established offices for AppNet and negotiated and agreement with Defendant Bajaj giving Plaintiff Harvey, McCalley and McManus each a salary of $160,000 per year and 1% of the stock in the company.

10. In March 1998, Plaintiff completed AppNet's first acquisition, Arbor Intelligent Systems, an Ann Arbor, Washtenaw County, Michigan Company. This acquisition provided AppNet with an approximately $3 million annual revenue stream and increased its staff from 6 to 40.

11. In May 1998, Plaintiff as well as Defendant Bajaj, McCalley and Mr. Gouldey of Fairfax Partners made a presentation of AppNet's business plan to Bruce Rouner a principal at Golder Thoma, Teshie and Rouner (GTCR, an investment firm in Chicago, Illinois), seeking a financial investment. During the approximately 6 weeks that followed, Plaintiff played a critical role in providing GTCR with the necessary information that convinced it to make the investment. Simultaneously, Plaintiff obtained

3

agreement from the owners of Software Services to sell their firm which would increase AppNet's forecasted revenues from $3.5 million to $19 million and raise the number of employees from approximately 45 to almost 300.

12. From on or about the 5th of May 1998 until the 29th of June 1998 Defendant repeatedly made reference to the urgency of obtaining the GTCR funding. Defendant alleged to Plaintiff, McCalley and McManus that GTCR was the approving body for the senior management agreements that were being drafted. At all times Defendant Bajaj controlled the communications between GTCR and Plaintiff, McCalley and McManus.

13. Defendant Bajaj engaged the firm of Tucker/Flyer, a Washington, D.C. based law firm to represent AppNet and himself in the negotiations with GTCR and (Smart Technology LLC) STI regarding the financing. Plaintiff and McCalley were encouraged by Defendant Bajaj to let Arthur Cirulnick, of Tucker/Flyer, represent their interests in the development of the senior management agreement and that he and Defendant Bajaj would try to convince GTCR to accept the terms. Again, Defendant Bajaj controlled any communications between GTCR and Plaintiff including Plaintiff's comments and responses regarding the terms and conditions of the senior management agreement.

14. Plaintiff, as well as McCalley and McManus had approximately four days to review and comment on the senior management agreements. During this time, all were working full time to run their respective parts of the business. Plaintiff was simultaneously negotiating the acquisition of Software Services Corporation, running the largest portion of the current AppNet business, providing due diligence responses to

4

GTCR and regularly traveling to Bethesda, Maryland to confer with the rest of the AppNet leadership.

15. Defendant Bajaj told Plaintiff Harvey, McManus and McCalley that it did not matter what was in the senior management agreement relative to termination without cause because he would not terminate them, even if he had to move them aside.

16. In this atmosphere of intense activity, the time pressure generated by the Defendant; Plaintiff's belief he was being represented by Tucker/Flyer; that the negotiations for the content of the agreement were between Plaintiff and GTCR; that the Defendant Bajaj promised that no matter what happened Plaintiff would always have a job with AppNet; the long term relationship that existed between Plaintiff and Defendant Bajaj; and the impression created by Defendant Bajaj that if there were any delays it put the whole company in jeopardy, the Plaintiff signed the senior management agreement.

17. Plaintiff relied upon all of the promises and representations by Bajaj as set forth in more specificity hereinabove.

18. Pursuant to the senior management agreement, the actual number of shares granted to the Plaintiff was reduced to 340,000 shares. The shares were further divided into two categories, "carried stock" (160,000 shares received in lieu of salary), and "additional stock" (180,000 shares sold to Plaintiff at $.1055 per share with a Promissory Note). All of the original and additional stock became subject to a certain vesting schedule depending on the length of employment with AppNet as set forth in the Senior Management Agreement.

5

19. Both prior to, and subsequent to, execution of the senior management agreement on June 29, 1998, Defendant Bajaj assured Plaintiff that he would never have to worry about the terms of the senior management agreement because he would always have a job with the company and would never be fired

20. Plaintiff Robert G. Harvey continued to perform his job duties on behalf of AppNet after execution of the Senior Management Agreement, as he had prior to its execution, never believing that the company would arbitrarily, without notice and without cause terminate his employment because of the assurances he had received from Defendant Bajaj.

21. AppNet filed its initial Public Offering June 18, 1999 on the NASDAQ stock exchange.

22. On or about June 30, 1999, Defendant Bajaj removed Plaintiff Harvey and McCalley from their operational responsibilities, allegedly to consolidate operations of the company.

23. On or about June 30, 1999, Defendant Bajaj published the new management organization with no mention of Plaintiff Harvey or McCalley.

24. On or about August 21, 1999, Plaintiff received a letter from AppNet's Human Resources Department terminating him from AppNet and exercising the option to purchase 56.5% of his stock for a nominal amount of approximately 10¢ per share despite the stock having a per share price value as of November 6, 1999 of $54.00 per share. (**Exhibit A** - August 9, 1999 correspondence).

25. Plaintiff's termination was contrary to the representations of Bajaj at the time of creation of AppNet, and both prior to and subsequent to execution of the Senior

6

Management Agreement, that Harvey, as a founder of the company would have continued employment with the company and there would be no termination without cause and all of his stock ownership would be fully vested.

26. The June 29, 1998 Senior Management Agreement in Paragraph 8(a) provides for a period of non-competition subsequent to Plaintiff's employment termination for a one year period, with AppNet having an option to extend such term for an additional one year, for a total of two years of non-compete for an employment that, under the Senior Management Agreement, lasted 13 months. Such non-compete is purported to apply anywhere in the United States, in any business Defendant was engaged in at the time of the employment termination.

## *COUNT I - BREACH OF EXPRESS CONTRACT*

27. Plaintiff incorporates by reference Paragraphs 1 through 26 as if fully set forth herein.

28. Defendant Bajaj at the time of solicitation of Plaintiff Robert Harvey to form AppNet represented, promised and agreed that Harvey as a co-founder would remain as a senior of the company and would not be terminated from his position as an employee or stockholder without just cause.

29. These representations made by Bajaj on or about June 1998, were made in his individual capacity and upon formation of the company were made in his capacity as President and Chairman of the Board of AppNet.

30. Both prior to, at the time of, and subsequent to execution of the June 29, 1998 senior management agreement, Harvey had discussions with Bajaj concerning his

7

employment security with AppNet, which included the four-year stock vesting period for Plaintiff's shares of stock.

31. Prior to, during, and subsequent to execution of the senior management agreement, Bajaj assured Harvey that his employment with the company was secure and that 100% of his interest in the shares of common stock of the company would be vested.

32. Bajaj at the time of making those commitments to Harvey was the Chairman of the Board and President of AppNet, and the party who executed the senior management agreement on behalf of AppNet.

33. At all times Bajaj was the senior most employee of AppNet and the only officer authorized to make such express agreements relative to employment security with Plaintiff, Robert Harvey.

34. Plaintiff accepted Bajaj statements, promises and agreement and continued in his employment with AppNet confidant that such employment would continue on a long-term basis and that 100% of his stock would be vested.

35. The termination of Plaintiff's employment on or about August 9, 1999 was a breach of his employment contract as expressed by Defendant Bajaj both prior to and subsequent to execution of the senior management agreement. Such representations of Bajaj superceded conflicting provisions of the senior management agreement.

36. Such termination was without prior notice, without cause, was carried out in an improper manner, was not acquiesced to by Plaintiff and has resulted in loss of significant value of allegedly unvested portions of Plaintiff's stock.

37. Defendant refuses to pay to Plaintiff the full value of all of the shares of his stock, contrary to the terms of his employment arrangements as confirmed by Defendant Bajaj.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, AppNet Systems, Inc. and Ken S. Bajaj, in such amount in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

## *COUNT II - CONTRACT IMPLIED IN FACT*

38. Plaintiff incorporates by reference Paragraphs 1 through 37 as if fully set forth herein.

39. The actions and statements of Bajaj surrounding the execution of the senior management agreement were reasonably believed and relied upon by Plaintiff Harvey.

40. Bajaj intended to induce Plaintiff to execute the new Senior Management Agreement and to continue in his employment in the company he helped co-found and create. Plaintiff Harvey reasonably accepted the promises and statements by Bajaj of his job security such that there would be no termination without just cause and that all of Plaintiff's stock benefits would be vested at such time as Plaintiff left the company.

41. Plaintiff reasonably relied upon such statements by an individual with full authority to act on behalf of the company and has now been damaged by the termination and the company's refusal to pay to him the full value of his stock.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, AppNet Systems, Inc. and Ken S. Bajaj, in such amount in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

9

## COUNT III - PROMISSORY ESTOPPEL

42. Plaintiff incorporates by reference Paragraphs 1 through 41 as if fully set forth herein.

43. This count is presented by way of alternative pleading in the event that the Court finds that no express contract existed between Plaintiff and Defendant as set forth hereinabove.

44. Defendant Bajaj, acting as President and Chairman of Defendant AppNet, made an actual, clear and definite promise to Plaintiff of continued employment with AppNet following execution of the senior management agreement and during the entire time of vesting of rights in stock which was being purchased.

45. Defendant Bajaj reasonably expected to induce Plaintiff to believe his promises and descriptions of Plaintiff Harvey's continued employment with AppNet and to induce execution of the senior management agreement without further negotiations.

46. Plaintiff in reliance on Bajaj statements to him since 1997 and surrounding execution of the senior management agreement accepted same, executed it, and continued on in his employment.

47. Defendant Bajaj promises of security in employment and tenure in order to vest all rights in the stock being purchased must be enforced if injustice is to be avoided because otherwise Defendant will be permitted to repurchase 56.25% of Plaintiff's 340,000 shares (prior to 2.85 to 1 reverse stock split) of common stock in the company at a nominal value.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, AppNet Systems, Inc. and Ken S. Bajaj, in such amount in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

## *COUNT IV - INVALIDITY OF NON-COMPETITION AGREEMENT*

48. Plaintiff incorporates by reference Paragraphs 1 through 47 as if fully set forth herein.

49. Under the terms of the senior management agreement, Paragraph 8(a) provides that upon termination of employment with the company Plaintiff may not engage in any competitive activity with the company for a period of one year and, at the option of AppNet, that one year may be extended to a two year period.

50. Such non-competition period in relation to the 13-month term of Plaintiff's employment under the senior management agreement is unreasonably long.

51. The non-competition geographical area is anywhere in the United States which is unreasonably broad.

52. The definition of competition is also unreasonably broad and ambiguous in its definition and presumably Plaintiff could not engage in any aspect of the software development business without violating the non-competition agreement.

53. Plaintiff is entitled to earn a living in the field of his choice and to utilize his own knowledge and experience in the industry developed over the years.

54. The covenant not to compete is unreasonable in scope because of Plaintiff's length of time that he had been in the industry and his knowledge, skill and facility acquired during the entire period of time he has been in the industry, including the time with Defendant. Such knowledge, skill and facility is neither confidential nor a

11

trade secret and thus Plaintiff should be permitted to engage in employment in the industry providing that he does not reveal any actual trade secrets or confidential information of Defendant.

**WHEREFORE**, Plaintiff prays that this Court enter judgment declaring that the covenant not to compete is not enforceable as it is unreasonable in its length, its geographic scope and in the breadth of its definition of confidential information, trade secrets and scope of business.

## COUNT V - FRAUD IN THE INDUCEMENT

55. Plaintiff incorporates by reference Paragraphs 1 through 54 as if fully set forth herein.

56. Defendant Bajaj misrepresented that GTCR was the approval authority for the Plaintiff's senior management agreement. The Defendant signed the agreement for AppNet.

57. Defendant Bajaj misrepresented that the terms of senior management agreements meant nothing and that Plaintiff could rely on Bajaj's oral representations regarding future employment and the vesting of stock options.

58. Defendant Bajaj misrepresented that Plaintiff was represented in contract negotiations by the Tucker/Flyer law firm.

59. Representations by Bajaj concerning CTCR's approval authority, the effect of senior management agreements, Plaintiff's representation by the Tucker/Flyer law firm, Plaintiff's job security with the company, the full vesting of his stock and that Plaintiff Harvey would not be terminated for any reason or without just cause were

material representations by Bajaj with the intention of inducing Plaintiff to rely upon them and to sign the senior management agreement.

60. Plaintiff in full reliance upon the representations of Bajaj, and given his participation as a founder in AppNet, signed the senior management agreement, continued on in his employment and continued his full efforts working for the benefit of the company.

61. That Defendant Bajaj had no intention of honoring his commitment to Plaintiff Harvey in that less than one month after AppNet attained its goal of an initial public offering, Defendant Bajaj terminated Plaintiff Harvey from his employment without cause.

62. That entry into such contract and continued employment without further negotiations, delineation or other written documents expressing the full scope of Bajaj promises and representations inured to the benefit of Bajaj and has resulted in significant damages to Plaintiff as a result of the attempted and alleged termination of his employment and shareholder status.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, AppNet Systems, Inc. and Ken S. Bajaj, in such amount in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

### COUNT VI- ECONOMIC DURESS

63. Plaintiff incorporates by reference Paragraphs 1 through 62 as if fully set forth herein.

64. During an atmosphere of intense activity and enormous time pressure generated by the Defendants in June 1998, Plaintiff reasonably believed the following:

WILLIAMS, WILLIAMS, RUBY & PLUNKETT, P.C. 380 N. OLD WOODWARD AVENUE, SUITE 300 BIRMINGHAM, MICHIGAN 48009 TELEPHONE (248) 642-0333

i) that he was being represented by Tucker/Flyer based upon Defendant Bajaj's fraudulent assertions; ii) that the negotiations for the content of the senior management agreement were between Plaintiff and GTCR based upon Defendant Bajaj's fraudulent assertions; iii) that GTCR was the approval authority for the Plaintiff's senior management agreement based upon Defendant Bajaj's fraudulent assertions; iv) that the terms of the senior management agreement meant nothing and that Plaintiff could rely on Bajaj's oral representations regarding future employment, the vesting of stock options and Bajaj's promise that AppNet would never exercise the option to buy back Plaintiff's shares at the option price as provided in the senior management agreement, all based upon Defendant Bajaj's fraudulent assertions; v) that Plaintiff could trust Bajaj based upon the long term relationship that existed between Plaintiff and Defendant Bajaj and; vi) Defendant Bajaj's misrepresentations that that if there were any delays in obtaining financing it put the whole company in jeopardy. Though Plaintiff objected to Defendant Bajaj that the terms of the senior management agreement he was being asked to sign conflicted with the employment relationship he had been promised, Defendant Bajaj reassured and pressured Plaintiff, as described above. Based on the above, Plaintiff signed the senior management agreement in June 1998.

65. Plaintiff had approximately four days to review and comment on the senior management agreement. During this time, Plaintiff was working full time to run his respective part of the business. Plaintiff was simultaneously negotiating the acquisition of Software Services Corporation, running the largest portion of the current AppNet business, providing due diligence responses to GTCR and regularly traveling to Bethesda, Maryland to confer with the rest of the AppNet leadership.

66. In June of 1999 when Plaintiff executed an amendment to the senior management agreement, Plaintiff was again acting in reliance upon the above fraudulent misrepresentations of Defendant Bajaj in addition to a representation by Bajaj that Plaintiff's execution of the amendment was a condition precedent to AppNet's effort to go public on June 18, 1999 and that any delays in executing the Amendment on Plaintiff's part put the whole effort to take the company public in jeopardy. Plaintiff was presented with and signed the amendment just four days prior to the date that AppNet was scheduled to and did become a public company on June 18, 1999.

67. As a direct result of above specified fraudulent acts of Defendant Bajaj, Plaintiff was unlawfully coerced and compelled to execute the senior management agreement and an amendment thereto under the fear of AppNet's financial ruin or serious injury to business opportunities amounting to economic duress. As noted, Plaintiff had staked his fortune and financial future in AppNet and the shares in AppNet to which he reasonably expected to receive.

68. Because of the enormous time pressure under which Plaintiff executed the senior management agreement and an amendment thereto, Plaintiff had no reasonable opportunity to investigate or reflect upon his legal options or consult independent legal advice.

69. Because of the enormous time pressure under which Plaintiff executed the senior management agreement and an amendment thereto, Plaintiff had no reasonable opportunity to seek an immediate or adequate legal remedy to any reasonably anticipated breach of contact by Defendants.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, AppNet Systems, Inc. and Ken S. Bajaj, in such amount in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees

### COUNT VII- REFORMATION

70. Plaintiff incorporates by reference Paragraphs 1 through 60 as if fully set forth herein.

71. The senior management agreement with respect to the longevity of Plaintiff's employment, scope of the company's rights to terminate employment and vesting of Plaintiff's stock ownership, do not accurately express the agreement between Plaintiff and Defendant Bajaj on all of those terms.

72. Such mistake of fact is one resulting from Defendant Bajaj material misrepresentations as set forth hereinabove.

73. The contract should be reformed to express the mutual agreement of the parties as expressed by Bajaj to Plaintiff.

74. Bajaj was well aware that the contract did not accurately express Harvey's intentions in signing it and that such understanding and intentions of Harvey were the result of Bajaj representations and inducements.

75. As a result of this mistake of fact based upon Defendant Bajaj misrepresentations, Plaintiff has been significantly damaged as set forth hereinabove.

**WHEREFORE**, Plaintiff prays for entry of an Order reforming the senior management agreement to provide for 100% vesting of all stock and other benefits, termination only for cause and that Plaintiff be awarded such damages in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

## COUNT VIII-TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AND EXPECTANCY

76. Plaintiff incorporates by reference Paragraphs 1 through 75 as if fully set forth herein.

77. On or about December 9, 1999 Defendant AppNet directed to the attention of certain qualified stockholders of AppNet a letter informing these stockholders that certain "lock-up agreements" entered into by the stockholders in connection with the public offering of AppNet stock in June, 1999 were set to expire on December 14, 1999 and that each of these stockholders had, therefore, held their common stock in AppNet for more than one year pursuant to Security and Exchange Commission Rule 144.

78. The letter informed the stockholders that AppNet had arranged with Credit Swisse First Boston Corporation ("CSFB") to provide for a special selling pool in which qualified stockholders could sell common stock on or before December 14, 1999.

79. Plaintiff received a copy of the above referenced letter and was a stockholder qualified to sell stock in AppNet pursuant to Security and Exchange Commission Rule 144.

80. On December 13, 1999 Plaintiff by phone and letter directed CSFB to sell some 6000 shares of his owned and vested common stock in AppNet.

81. Upon information and belief, Defendant AppNet, through its General Counsel, William Dawson, contacted CSFB and directed CSFB not to allow Plaintiff to sell any of his common stock during the open selling period that was set to expire on December 21, 1999.

82. Defendant AppNet's actions in intentionally interfering with Plaintiff's business relationship with CSFB and business expectancy that CSFB would execute the directed sale of 6000 shares of common stock was done for an unlawful and malicious purpose and was not related to the exercise of AppNet's valid legal rights.

83. Defendant AppNet's actions in intentionally interfering with Plaintiff's business relationship with CSFB and business expectancy that CSFB would execute the directed sale of 6000 shares of common stock has caused Plaintiff direct financial damage.

**WHEREFORE**, Plaintiff prays for entry of an Order reforming the senior management agreement to provide for 100% vesting of all stock and other benefits, termination only for cause and that Plaintiff be awarded such damages in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

### COUNT IX- BREACH OF FIDUCIARY DUTY

84. Plaintiff incorporates by reference Paragraphs 1 through 83 as if fully set forth herein.

85. Defendant AppNet, through its officers and directors, owed Plaintiff, as a shareholder of AppNet, both statutory and common law fiduciary duties including:

(a) the duty to act with utmost good faith and loyalty toward Plaintiff;

(b) duties of trust and confidence;

(c) the duty to render true and full information.

86. As a result of Defendant AppNet's actions in intentionally interfering with Plaintiff's business relationship with CSFB and business expectancy that CSFB would

18

execute the directed sale of 6000 shares of common stock, AppNet breached its trust and fiduciary obligations to Plaintiff.

**WHEREFORE**, Plaintiff prays for entry of an Order reforming the senior management agreement to provide for 100% vesting of all stock and other benefits, termination only for cause and that Plaintiff be awarded such damages in excess of $25,000 as Plaintiff is entitled, plus assessment of costs, interest and attorney fees.

Respectfully submitted,

WILLIAMS, WILLIAMS, RUBY & PLUNKETT

BY: *James A. Williams*
JAMES A. WILLIAMS (P22349)
JOHN W. GRIFFEN, JR. (P14375)
RICHARD E. RASSEL, III, (P57540)
Attorneys for Plaintiff
380 N. Old Woodward Ave., Suite 300
Birmingham, MI 48009
(248) 642-0333/fax 642-0856

DATED: January 28, 2000
00110187

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED